2018 IL App (2d) 180764-U
No. 2-18-0764
Order filed November 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-224 |
| JOHN CASSIMATIS, | ) ) | Honorable John F. McAdams, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant did not receive ineffective assistance of *Krankel* counsel during the second-stage adversarial hearing on his motion alleging ineffective assistance of trial counsel. Affirmed.

¶ 2    After a jury trial, defendant, John Cassimatis, was convicted of aggravated stalking (720 ILCS 5/12-7.4(a)(3) (West 2016)) and violating an order of protection (720 ILCS 5/12-3.4 (West 2016)). The trial court sentenced him to four years' imprisonment on the aggravated-stalking conviction. On direct appeal, this court held that defendant's statement in allocution raised an implicit *pro se* ineffective-assistance-of-trial-counsel claim that was sufficient to trigger a

preliminary (*i.e.*, first-stage) examination, consistent with the procedure in *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), and we remanded for a preliminary *Krankel* inquiry. *People v. Cassimatis* (*Cassimatis I*), 2018 IL App (2d) 150426-U, ¶¶ 84-85.

¶ 3    On remand, the trial court conducted a preliminary inquiry into defendant's *pro se* claims and found possible neglect by trial counsel. Accordingly, the court appointed counsel (*i.e.*, *Krankel* counsel) to represent defendant's ineffective-assistance claims at a second-stage adversarial hearing. *Krankel* counsel filed a written motion, asserting trial counsel's deficient performance. After a second-stage *Krankel* hearing, the trial court denied the motion. Defendant appeals, arguing that *Krankel* counsel deprived him of effective representation at the *Krankel* hearing, where counsel adopted, presented, and argued two of defendant's *pro se* ineffective-assistance claims, but failed to provide the necessary evidentiary support for the claims. He requests that we reverse and remand for new proceedings with the benefit of new and effective *Krankel* counsel. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5    In April 2013, defendant, age 77, was charged by indictment with aggravated stalking, stalking, and violation of an order of protection. Prior to trial, the State *nol prossed* the stalking charge.

¶ 6    The charges arose from acts that occurred between July 2012 and April 2013. The State alleged that defendant placed Sherry Carlson under surveillance at 2300 Sycamore Road (a Walmart store) and directed a third party, Tyrell Mitchell, to enter a protected address at 8967 Baseline Road in Kingston (the farm) and take pictures.

¶ 7    At a March 27, 2014, pre-trial hearing, Judge Robbin Stuckert commented that, due to technical issues with an initial disk, she had been tendered a second disk containing a recording of a conversation between defendant and Mitchell.

¶ 8                                A. Sherry Carlson

¶ 9    Trial commenced on September 9, 2014.  Carlson testified that she knew defendant, because she had rented a room from him at his residence at the farm, which is at the corner of Annie Glidden Road and Base Line Road.  The property is in a rural area, spans five acres, and has several outbuildings.  Carlson briefly dated defendant while she lived at his residence.  Also during this time, around September 2010, the farm was going into foreclosure and defendant was planning on moving to Florida.  Carlson purchased the farm at a sheriff's auction.  Sometime after her relationship with defendant had ended, Carlson married Jeffrey Maye.

¶ 10    In October 2011, Carlson obtained an order of protection against defendant, which required defendant to stay away from certain residences and places of employment.  Between September 8, 2011, and September 19, 2011, defendant, on three occasions, appeared at Carlson's residence (a house on Neil Road in Sugar Grove, where defendant drove by and looked in the windows) or place of employment (in Aurora).  On October 18, 2011, defendant waited outside Carlson's place of employment and, as she drove away, he followed her through downtown Aurora.  Carlson called 911, defendant was arrested, and, ultimately, in 2012, he was convicted in Kane County of aggravated stalking and violation of an order of protection.

¶ 11    As part of his sentence, defendant was required to submit to GPS monitoring and was directed to stay at least 1500 feet from Carlson and certain protected addresses.  One of those addresses was the farm.  The order of protection prohibited defendant from contacting Carlson

directly, indirectly, or through third parties. It also prohibited him from putting Carlson under surveillance.

¶ 12    Between late 2012 and early 2013, Carlson lived at the farm. She occasionally saw defendant at the Walmart, Aldi, or Walgreen's stores or driving on Sycamore Road in De Kalb. The Walmart, Aldi, and Walgreen's are not protected addresses. She also saw him on Base Line Road in De Kalb. Carlson never observed him on the farm, nor did she ever see anyone, in person or on the surveillance video, suspicious or unfamiliar on the farm.

¶ 13    Carlson further testified that she received numerous calls from the GPS officer that indicated that defendant was bordering the perimeter of a protected address. On one occasion, in March 2013, at about midnight, Carlson, who was alone at the farm, received a call from the GPS officer, stating that defendant was bordering the perimeter of the property and that she needed to put into effect her emergency plan and leave the residence. Carlson carried out her emergency plan about four or five times in March 2013. Also during that month, Carlson and Maye were contacted by Mitchell. Afterwards, they contacted the police. Carlson is afraid, feels that she cannot go anywhere alone, and does not feel safe.

¶ 14                              B. Tyrell Mitchell

¶ 15    Tyrell Mitchell testified that he spent six years in prison for possession of a controlled substance and had a DUI conviction. Further, he was on probation for two felony violations of an order of protection. Mitchell testified that he received no favors for testifying.

¶ 16    Mitchell met defendant when they were both in custody in the Kane County jail in January 2012. After he was released, Mitchell stayed with defendant for one week, because defendant was assisting Mitchell with legal matters.

¶ 17    Mitchell testified that, on July 1, 2012, defendant rented a vehicle and instructed Mitchell to drive himself to the farm.  He gave Mitchell a box camera and asked him to take pictures of the property and to turn off the wind turbine if it was running.  Defendant also asked Mitchell to take photos of the inside of the house, but Mitchell did not do so, explaining that there was a surveillance camera on the porch.  Mitchell photographed the buildings on the property, a black Expedition truck, and the inside of the barns, all at defendant's request.  He then returned the camera to defendant.  Mitchell testified that he was aware at this time of the orders of protection against defendant and that defendant was not supposed to be on the property.

¶ 18    In August 2012, Mitchell again stayed with defendant, at Parkside Apartments on Sycamore Road in De Kalb.  While there, defendant spoke about Carlson and Maye, stating that he wanted to have their legs broken, referring to it as teaching them how to play baseball. Defendant asked Mitchell if he could refer him to anyone who could do that for him.  Mitchell did not refer defendant to anyone.

¶ 19    In late September/early October 2012, defendant asked Mitchell to accompany him to Walmart in De Kalb.  As they pulled into the parking lot, defendant pointed out Carlson and Maye's black Mercedes.  Carlson and Maye were sitting in the vehicle.  Mitchell did not know why defendant pointed out the couple or the car.

¶ 20    In January 2013, defendant again asked Mitchell for help in obtaining drugs and finding someone to plant them in Maye's truck.  Defendant and Mitchell were staying at Hope Haven, and Mitchell learned that word was getting out that Mitchell was defendant's hit man.  Mitchell, who was still on parole, did not want to return to prison.  He feared that, if something happened to Carlson or Maye, his affiliation with defendant would get him into trouble.  Shortly after this,

Mitchell contacted Carlson and Maye to alert them. He also cooperated with the police and agreed to wear a wire while meeting with defendant for lunch.

¶ 21 On April 4, 2013, Mitchell had lunch with defendant at China House restaurant in De Kalb as part of an overhear. The recording was played for the jury. At one point during the conversation, Mitchell stated, "I looked out for you. You know, I'm going, doing reconnaissance missions and shit for your ass and all that shit, man." Defendant responded, "yep." Mitchell stated, "So we know – you know, we – we helping each other out, you know what I mean? You know, I go out there. You know, I took the pictures of farm and shit for you, you know what I mean? Just take – taking the chance, you know what I mean? Getting tied up in this mess, man." Defendant responded, "I don't want you tied up in what happens. It came back to [De Kalb sheriff's detective] Brad Carls that I was associated with you and that you were a hit man."

¶ 22 Later in the conversation, Mitchell stated, "I said remember back up in September, October, when you came and picked me up and we went up to Walmart and you pointed Sherry and Jeff out to me? You showed me the – the black Mercedes, right? What – what other car does she drive?" Defendant responded, "They drive a Ford Explorer, the one that you saw in the driveway." Mitchell stated, "Yes." Defendant then stated, "And they drive a – another Mercedes, a – a CLK 320." Defendant then discussed his attempts to raise money to get the farm back.

¶ 23 Mitchell told defendant that he had been laid off again and needed money. He attempted to persuade defendant to give him money. Defendant replied that he would have funds if he got back the farm. Defendant offered to connect Mitchell to a friend so he could make money selling "weed." Defendant responded in the affirmative when Mitchell stated he would teach Maye to play baseball, defendant's way of saying break someone's legs, for $500. Later, defendant stated that Maye "deserves a kneecap opened." Mitchell mentioned the windmill at the farm, and

defendant responded that he knew it was still there, because he "passed by there last night" and again "this morning." Later, defendant asked Mitchell if it was "worth a kneecap, so [Maye] never walks again?" He also stated that, if both Maye and Carlson were done, it would tie defendant to them. Mitchell asked, "So what, one at a time?" Defendant replied, "Yeah." Mitchell then confirmed that they would "go for [Maye] and [Carlson's] shit." Defendant replied in the affirmative.

¶ 24 After the overhear was played for the jury, defense counsel cross-examined Mitchell. Mitchell admitted to his recent guilty pleas in two felony violation-of-order-of-protection cases, for which he was sentenced to two years' imprisonment, but which was stayed pending compliance with the probation orders, and denied that the plea agreements had anything to do with his testimony against defendant.

¶ 25 Addressing the Walmart incident, Mitchell testified that he and defendant were there for about three or four minutes. They drove into the parking lot, saw Carlson and Maye enter their car, drove around the parking lot, and left. They did not make contact with Carlson or Maye or follow them.

¶ 26 C. Matthew Peterson

¶ 27 Matthew Peterson, a supervisor at Kane County Court Services, supervised the county's electronic monitoring program. Beginning in 2012, Peterson tracked defendant's movements through a GPS device, which tracks defendant's movements within a 30-foot radius. He identified printouts, which were admitted into evidence, depicting defendant's GPS movements in March and April 2013 and late September/early October 2012.

¶ 28 The March and April 2013 exhibits showed defendant's GPS monitor traveling on Glidden Road, passing the farm. The exhibits from September and October 2012 showed him driving on

Sycamore Road in De Kalb. During the monitoring period, defendant lived on Sycamore Road in De Kalb, south of the farm.

¶ 29    During the two-year period that defendant was on the GPS monitoring, he never crossed into the 1500-foot exclusion zones surrounding Carlson's protected addresses. If the exclusion zone had been violated, Carlson would have been contacted. Peterson did not know whether Carlson was ever present when defendant drove near the exclusion zones.

¶ 30                                    D. Brad Carls

¶ 31    Brad Carls, a detective with the De Kalb County sheriff's office, testified that he was familiar with defendant, Carlson, and the order of protection in this case. Walmart was not listed as a protected address in the order of protection. Carls knew that, in September and October 2012, defendant lived in an apartment within a "[r]easonable proximity" to the Walmart. He was supposed to be living in Aurora, but chose to live in De Kalb County. (Carlson lived in Kingston, at the farm, at this time.) During that same period, Carls never received any reports from Carlson that defendant followed or made any contact with her at Walmart.

¶ 32    Addressing the overhear, Carls testified that Carlson contacted him. As a result, on March 22, 2013, Mitchell met with Carls and sheriff's office personnel obtained an order authorizing an overhear of Mitchell's lunch with defendant. Carls denied that Mitchell was offered anything in exchange for his cooperation in this case. He did give Mitchell money for lunch at China House and $50 to give to defendant. The overhear was conducted on April 4, 2013, and, as a result, Carls subsequently, on April 17, 2013, obtained a warrant for defendant's arrest.

¶ 33    Carls also testified that, on April 23, 2013, he drove to the farm and took photographs at the corner of Base Line and Glidden Roads. He selected this location because GPS monitoring information reflected that defendant often travelled that route and his vehicle was coming to almost

a complete stop in that area. At this corner, one can see the west side of the property and if any vehicles are parked at the house. The photographs were admitted into evidence.

¶ 34    The State rested.

¶ 35                                    E. Defendant

¶ 36    Defendant, age 77, testified that, in 2010, he lived at the farm and had owned it for 14 years. In January 2012, defendant met Mitchell in the Kane County jail. After Mitchell got out of jail, defendant occasionally let Mitchell stay at his place when defendant was not there.

¶ 37    Defendant denied that he ever asked Mitchell to go to the farm, take photographs of the farm, make contact with or follow Carlson, turn off the windmill at the property, or provide Mitchell with money to perform illegal acts on his behalf. He also denied ever going to Walmart with Mitchell and denied ever providing him drugs to place in Carlson's or Maye's vehicles.

¶ 38    Addressing the overhear, defendant stated that he reviewed it "[e]xtensively." According to defendant, he counted three occasions when he told Mitchell that he did not want him involved in the situation. Defendant testified that, at various parts of the conversation, he could not understand what Mitchell was saying. As to the farm photos, defendant testified that he was referring to photos of his farm that he had printed off the internet.

¶ 39    Defendant was also asked the following question concerning the overhear:

"And when [ ] Mitchell said that I remember back in September, October when you came and picked me up and we went to Walmart and you pointed [Carlson] and [Maye] out to me, you showed me the black Mercedes, right, what other car does she drive, you responded they drive a Ford Explorer, the one you saw in the driveway. Is that correct?"

Defendant responded, "That's correct. That was in the driveway at – that was in the driveway of – going into Jewel." This was "[a]cross the street from my apartment."

¶ 40    When defendant was asked if he identified Carlson and Maye's other vehicle, the black Mercedes convertible, he responded, "I don't know if I did or not. I might have." Defendant explained that he was familiar with the vehicles and their license plate numbers, because he paid for their registrations and drove them (presumably during the time Carlson and defendant lived at the farm).

¶ 41    Defendant denied driving past the farm. When asked a second time whether he drove past the farm, he responded, "I have not driven past my farm in two years. I drove down Glidden Road, and that's my constitutional right, and I intend to exercise it." Defendant was asked, "So you drove down Glidden Road past the farm, correct?" He responded, "No, I did not drive down Glidden Road past my farm. You can't help passing on the side of the road. You can view it from Glidden Road." He testified that the farm is 3,700 feet from Glidden Road. Next, defendant was asked, "So when you indicated to [ ] Mitchell that somebody was staying at the farm, you could see if there were people on the property. Is that correct?" Defendant stated, "My lights might have – may have been on. There's a security light on – there's a security light there."

¶ 42                            F. Verdict and Sentencing

¶ 43    The jury convicted defendant of aggravated stalking and violation of an order of protection. At sentencing, on November 12, 2014, defendant gave a statement in allocution, explaining how he had tried to help Carlson with her drug and alcohol problem, to get her life together, let her live with him when her house was unlivable, and spent $56,000 fixing up Carlson's house. He claimed that Carlson and Maye owe him a lot of money. Further, defendant maintained that Carls tampered with the overhear tapes, because he allegedly had an affair with "her" (presumably Carlson) and that he had told his attorney that parts of the record were missing:

"Every time I called the police to do help, help something in De[ ]Kalb County I've gotten nothing, and I've had nothing but problems with Brad Carls for three years because he's had an affair with her, okay, and he tampered with – he tampered with the tapes and I know they are tampered with because there's excerpts missing and I told my attorney exactly some of the excerpts that are missing."

Later, defendant returned to the tampering issue:

"The last time I was convicted there's no evidence.  There's no pictures.  He had – that guy right there, do you see the smirk on his face?  He's had this – he's had this vendetta against me and I know he tampered with the tapes and I can prove it to you and I'll get this matter straightened out and I'll get an audio expert and I'll show you exactly what transpired through this whole thing."

Defendant also claimed a disbarred attorney fabricated the overhear transcript:

"Your Honor, through this all there's a gentleman who is an ex-barred attorney by the name of – by the name of Ed Varger who I have known for a long time.  He's a disbarred attorney.  He's a convicted federal felon.  He's the one who wrote this script.  That's all it is.  It's a script.  There's nothing factual in it."

Defendant then again addressed the alleged tampering:

"I apologize to the Court for taking – taking this time, but I would like to emphatically state that Mr. Brad Carls and [detective] Sarah Frazier tampered with those tapes.  Okay?  There's a lot of excerpts missing in them, and I will prove to you through some way somehow that they were tampered with.  There's many excerpts missing, and it just disturbs me that I spent 581 days in custody for something I haven't done."

¶ 44 Finally, defendant also referenced a potential witness, Taylor Carlson (Sherry's daughter), whom he had asked his attorney to contact:

"I had asked my attorney to contact Taylor who would have come up and told basically what her mother was all about, but her mother's – her mother is the one that needs help. All I've done is tried to help her through this whole period. This is where I'm at."

¶ 45 The trial court thanked defendant and took a recess to consider the sentence. After the recess, the court sentenced defendant to four years' imprisonment, followed by four years' mandatory supervised release. The following day, the court merged the two counts, finding that the order of protection violation was a lesser-included offense of aggravated stalking. The trial court also denied defendant's motions for a new trial and to reconsider and reduce sentence. Defendant appealed.

¶ 46                                              G. *Cassimatis I*

¶ 47 In *Cassimatis I*, defendant argued that the stalking statute was unconstitutional, the evidence was insufficient to sustain his aggravated stalking conviction, and that his complaints of ineffective assistance of counsel were sufficient to trigger the trial court's duty to conduct an inquiry into the merits of his claims under *Krankel*. This court rejected the first two arguments, but we concluded that the trial court had erred in failing to conduct a preliminary *Krankel* inquiry and we reversed and remanded for further proceedings on defendant's ineffective-assistance claims. *Id.* ¶¶ 84-85.

¶ 48                                      H. Proceedings on Remand

¶ 49                                        1. Preliminary Inquiry

¶ 50 On remand, on April 30, 2018, the court conducted a preliminary *Krankel* inquiry into defendant's claims. Defendant argued that, about one week before trial, he had given his trial

attorney, Daniel Transier, an affidavit from Rodney Stanton, Mitchell's cellmate. The affidavit, according to defendant, stated that Mitchell told Stanton that, even though he had a deal with the State, Mitchell was not going to testify against defendant, because it "[w]asn't true."

¶ 51 Defendant further alleged that he told Transier about Chris and Ken Getty, who would have testified that Sherry Carlson was intoxicated every time they saw her and was "very alcohol dependent." Also, defendant alleged he told Transier that Taylor Carlson, Sherry's daughter, would have testified that Sherry used drugs, was a drunk and a liar who fabricated stories and "does this constantly to other people," and that she had been untruthful in regard to an order of protection issued in Will County against her (prohibiting contact with her daughters).

¶ 52 Defendant also alleged that he told Transier that there were many parts of the conversation on the overhear that were missing, inaudible, or taken out of context. He asserted that he had asked Transier to look at notes defendant had prepared and bring them up as part of his defense. He also told Transier that Mitchell did not have a valid driver's license and that defendant drove Mitchell around and would never have given him a vehicle to drive. Defendant wanted Transier to raise this as part of his defense, but he did not raise it. Defendant also complained that detective Carls was prejudiced against him.

¶ 53 In response, Transier agreed that Stanton wrote an affidavit wherein he stated that Mitchell told him that he was not going to testify. Transier could not recall why Mitchell was not going to testify, but Mitchell did, in fact, testify. Transier did not recall anything in the affidavit that led him to believe that Mitchell's testimony would have been a lie or any substance as to why Mitchell was not going to testify. Defendant objected, and the trial court asked him if he had a copy of the affidavit. Defendant responded that it was in Transier's possession and that he had previously

asked trial counsel to bring it. Transier, in turn, maintained that he did not recall anything in the affidavit about Mitchell lying on behalf of the State.

¶ 54    Transier did not recall defendant complaining that Mitchell lacked a driver's license. Also, he spoke to the Gettys and determined that they had no information related to this case. Transier stated that he did not speak with Taylor Carlson, "because, like [defendant] said, the only thing she would be able to provide is testimony about [Sherry Carlson's] drinking habits" and her "overall character as being dishonest."

¶ 55    Transier also stated that he and defendant spoke at length about defendant's assertion that Carls was biased against him. Transier determined that it would not be to defendant's advantage to bring up at trial that Carls had arrested defendant five or six times in the past, because it would be unfairly prejudicial to defendant.

¶ 56    As to the overhear, Transier recalled listening to it in the jail with defendant and defendant telling him that portions were missing. When asked if he learned whether or not that was the case, Transier responded, "I didn't have any evidence that it was deleted, edited in any way, shape or form."  He did not discuss with defendant the possibility that Carls tampered with the overhear tape.

¶ 57    The trial court found that defendant's claims showed possible neglect, and it appointed Jack Slingerland to represent defendant at a second-stage adversarial *Krankel* hearing.

¶ 58                                  2. *Krankel* Hearing

¶ 59    On July 3, 2018, Slingerland filed a motion seeking a finding of ineffective assistance of counsel, alleging that trial counsel had provided ineffective assistance by failing to: (1) call Stanton as a witness to impeach Mitchell's trial testimony; (2) investigate the accuracy and completeness of the overhear recording; (3) call Taylor Carlson as a witness to impeach Sherry Carlson's

credibility; and (4) establish that Mitchell's driver's license was invalid and, due to the defendant's knowledge thereof, defendant drove Mitchell around and did not instruct Mitchell to drive anywhere. Only the second and third claims are at issue in this appeal, but, for context, we include below the testimony and proceedings relevant to the remaining claims.

¶ 60    At the August 21, 2018, *Krankel* hearing, defendant called Stanton and Transier. Stanton testified that he was cellmates with Mitchell at the De Kalb County jail in July 2014. Stanton prepared two affidavits to help defendant "in his situation": one in July 2014, which he gave to defendant, and a second, dated July 2, 2018, which was substantially similar to (and attempted to re-create) the (presumably lost) first affidavit. Both affidavits concern a conversation Stanton had with Mitchell. Stanton averred in the second affidavit that Mitchell told him that he had worn a wire during a lunch with defendant at China House and felt bad because everything Mitchell had said on the recording was coached by a detective and was a lie. A few weeks later, while still in jail, Stanton met defendant and gave him an affidavit about what Mitchell said to him. Stanton also testified that he met with defendant's attorney in 2014 and told him the same things that were contained in the affidavit.

¶ 61    On the issue of Stanton's affidavit, Transier testified that, prior to trial, defendant provided him with the affidavit, which summarized a conversation Mitchell had with Stanton concerning his testifying on the State's behalf in defendant's case. The affidavit stated that Mitchell was reluctant to testify on behalf of the State or was not going to testify on the State's behalf. Transier could not recall if the affidavit stated the *reason* Mitchell was reluctant, or not going, to testify. The affidavit was not introduced into evidence. Transier believed that he may have put the affidavit in defendant's file. He searched for it in preparation for the *Krankel* hearing, but could not locate it. Its contents were not used to impeach Mitchell at trial. Transier further testified that

he did not meet with Stanton. He did not believe that the affidavit addressed whether Mitchell told Stanton that everything he had said on the overhear was false or a lie. Transier further testified that he could not recall if the first affidavit said that the facts of the matter were untrue, that Mitchell lied about defendant, or that defendant stated numerous times that he was caught in a jam. He could not recall if the affidavit contained anything about the overhear.

¶ 62    Transier further testified that, in preparation for defendant's trial, he brought a recording of the overhear to the jail, and he and defendant listened to it. Afterwards, defendant told Transier that he believed the recording had been tampered with, in that portions of the conversation were not on the recording and other portions were inaudible. Transier could not recall if defendant gave him notes about the overhear, but he did give him "lots of notes that he and I would go through." Transier did not take any actions in terms of investigating or soliciting anyone's help to determine whether defendant's suspicions were accurate. During trial, he did not object to the jury having the transcript of the overhear. During Transier's conversations with defendant concerning the overhear, defendant never challenged that the portions that were audible in fact were his own and Mitchell's words. As to the alleged missing portions, defendant told Transier that he had told Mitchell not to go to the property that was subject to the order of protection. "No, don't do that," as to the farm and "No, Ty, don't do that. No, Ty, you can't do that." This was in the context of Mitchell going to the property at some point in the future after their lunch. At trial, the court reporter who transcribed the overhear testified to authenticate the transcript, and Transier cross-examined her and made the State lay a foundation for its admission.

¶ 63    Transier further testified that, before trial, he and defendant discussed potential witnesses, including Taylor Carlson. Defendant told Transier that Taylor would be able to testify about Sherry Carlson's alcohol abuse and lack of trustworthiness. Transier did not call Taylor to testify

at trial, because he was uncertain whether he could use that information in defendant's defense. "There was nothing specific about what [defendant] told me that would lead me to the belief that [Taylor] had any relevant information about the underlying charges themselves; just about how her mom is a drunk and liar."

¶ 64    Transier agreed that, prior to trial, defendant told him that Michell did not have a valid driver's license. Transier did not believe that Mitchell's driver's license status was particularly relevant, because many people drive without a license. "I deal with a lot of people get driving on suspended, no valid license. I was more concerned about [ ] Mitchell's criminal history in terms of impeachment than whether or not he had a driver's license."

¶ 65    Defendant rested, and the State did not present any evidence.

¶ 66    The trial court denied *Krankel* counsel's motion. As to the Stanton affidavit, the court credited Transier's testimony that he did not interview Stanton and it discredited Stanton's testimony on this point. The court also found that Stanton did *not* aver in his first affidavit that Mitchell told him that what he said on the overhear was not true. Rather, the court determined that Stanton averred in the first affidavit that Mitchell did not intend to testify or he was reluctant to testify and this would not have provided a reason for Transier to go interview Stanton. The court found incredible the assertion that Mitchell was reluctant, or not going, to testify because he was coached by detectives and that he lied. Accordingly, the trial court determined that Transier's failure to interview Stanton did not fall below an objective standard of reasonableness. The court further found that, even if Stanton had averred that Mitchell told him he had lied, Transier's failure to call him as a witness did not satisfy the second prong of *Strickland*, because, even if Stanton had testified that Mitchell was a liar, the court noted, the jury did not hear defendant state, on the overhear tape, that he disagreed with any of Mitchell's statements.

¶ 67    As to tape tampering, the trial court found that the fact that an earlier judge, Judge Stuckert, could not open the disk did not equate to tampering. The court also found that there was no evidence of tape tampering, and defendant's mere allegation that the tape was tampered with, without more, was not sufficient to reasonably warrant investigation by trial counsel, where counsel listened to the tape and it did not contain indications that any portion of the conversation was out of sequence that would warrant a professional analysis of the tape:

> "[T]he mere allegation without any other evidence that there is any problem with the tape, any problem in terms of there being gaps of time or any problem in terms of question, answer, question, answer or conversation where throughout somewhere in the tape there's a statement made and then the responsive statement is somewhat unrelated to that first statement indicating that there was a gap in time there or that there was some conversation that was missing or any statement by either one of the people who were on the tape that did not correspond to the other person's statements as part of the conversation.
>
> There's no indication other than the defendant's allegation, 'I think this tape was tampered with.' So the question is should a lawyer then go out and hire a professional to look at the tape to determine whether or not that it was tampered with. My answer to that is no, I don't think it's objectively reasonable that that attorney must in that case without anything else, without any other evidence other than the defendant's statement saying, 'Hey, I think this is out of whack here' that the attorney is then required to go to follow that lead up. Some lawyers would and some lawyers wouldn't, and I think that's the whole point about an objective standard of reasonableness or objective standard of professionalism, would every lawyer do it, is it objectively—is it a standard to go do that,

2018 IL App (2d) 180764-U

is it standard operating procedure for a professional defense attorney to do that, and my

answer to that is no."

The trial court further found that, given that trial counsel's performance was not objectively unreasonable on this issue, there was no prejudice.

¶ 68     As to potential witnesses, the trial court noted that, in a postconviction context, an attorney would have to provide an affidavit or some other indication of what a witness would testify to. As to Taylor Carlson, the trial court found that it was unclear if her testimony would have been admissible. Sherry Carlson, the court noted, did not testify that she saw Mitchell at the farm or that she saw defendant and Mitchell at Walmart. Rather, she testified to her emotional distress, the violations of orders of protection in Kane County, and that she felt she could not go anywhere by herself. As to Sherry's truthfulness, it was unlikely, the court found, that Sherry's testimony would have been impeached such that it would have changed the outcome of the case, given the violations of the orders of protection and that defendant had been convicted in another county. "Would it make the jury find that she was not afraid, given the fact that there's all these other violations of orders of protection, given the fact that he's already been convicted in another county for this?  I can't see how that would change the outcome."  As to the allegations concerning Sherry's alleged drinking, the court found,  "at best it would affect [Sherry's] credibility but not to the extent that it would change the outcome[,] because her testimony is believable that given the history of all of this it is affecting her emotionally, so I can't see how the fact that her daughter is going to say that her mom is a liar, it may, Mr. Singerland, it may go to, 'My mom's a liar so, therefore, the events didn't take place', but that's not what Sherry Carlson testified to[.]"  The court found that it did not fall below an objective standard of reasonableness to fail to interview Taylor and that, even if trial counsel did, it would not have changed the outcome.

¶ 69    As to the driver's-license issue, the trial court found that it was a matter of trial strategy not to investigate the claim and, thus, did not constitute ineffective assistance. The court denied *Krankel* counsel's motion. Defendant appeals.

¶ 70                                II. ANALYSIS

¶ 71    Defendant argues that *Krankel* counsel failed to provide effective representation at the *Krankel* hearing, where he adopted, presented, and argued two of defendant's *pro se* claims of ineffective assistance of trial counsel, but failed to provide necessary evidentiary support for the claims. Specifically, defendant argues that *Krankel* counsel was ineffective for failing to present supporting evidence that trial counsel was ineffective: (1) when he failed to call Taylor Carlson as a witness to discredit Sherry Carlson; and (2) when he failed to investigate whether the overhear recording had been tampered with. In denying defendant's *Krankel* motion, the trial court, defendant notes, relied on the lack of supporting evidence for these claims. Also, he contends that, due to the lack of evidence, there is an insufficient factual basis from which this court can assess prejudice. Defendant concludes that, due to *Krankel* counsel's deficient representation, the court's denial of his motion is "unreliable" (because it relied on the lack of supporting evidence in denying defendant's motion), and he asks that this court remand the case for appointment of new *Krankel* counsel and for a fair and adversarial hearing on his ineffective-assistance-of-trial-counsel claims.

¶ 72    Although this appeal concerns *Krankel* counsel's performance, an issue the trial court did not assess, defendant's arguments are identical to those he directed against trial counsel, whose performance the trial court did assess at the completion of the *Krankel* adversarial hearing. Therefore, because the trial court here reached a determination on the merits of defendant's ineffective-assistance claims, the identical claims he addresses on appeal (although directed against *Krankel*, not trial, counsel), we review the trial court's ruling to determine if it was

manifestly erroneous. See *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008) (trial court's ruling in preliminary *Krankel* inquiry that is based on its assessment that ineffective assistance claim was "spurious" will be reversed where it is manifestly erroneous). Manifest error is error that is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

¶ 73 A common-law procedure has developed following our supreme court's *Krankel* decision, and it "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. Under the common-law procedure, the trial court must first (in what is called the preliminary inquiry) examine the factual basis of the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the court determines that the claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel and may deny the defendant's *pro se* motion. *Id.* at 78. "A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40.

¶ 74 However, if the allegations show "possible neglect" of the case, then new counsel should be appointed. *Id.* Following the appointment of counsel (*Krankel* counsel), the case proceeds to the second *Krankel* stage, which consists of an adversarial and evidentiary hearing on the defendant's claims and during which *Krankel* counsel represents the defendant. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶¶ 43, 47 (*Krankel* counsel acts as "an advocate for the defendant, not for the State or the trial court") (emphasis omitted).

¶ 75 At the second-stage adversarial hearing, *Krankel* counsel must independently review the defendant's *pro se* ineffective-assistance allegations and then must present any nonfrivolous claims (*i.e.*, those with an arguable basis in law or in fact) to the trial court. *Id.* ¶¶ 49-50, 54. "[C]ounsel's obligation to represent the defendant requires him or her to present any nonfrivolous

claim to the trial court even where there remains a possibility or even likelihood that the defendant will not prevail on the claim." *Id.* ¶ 50.

¶ 76    Generally, claims of ineffective assistance of counsel are considered under the familiar standard established in *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). *People v. Cherry*, 2016 IL 118728, ¶ 24. This includes claims that *Krankel* counsel provided ineffective assistance. Id. ¶¶ 24-30. To prevail on a claim of ineffective assistance under *Strickland*, a defendant must show both that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant. *Id.* ¶ 24. "In other words, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *Downs*, 2017 IL App (2d) 121156-C, ¶ 39. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant must satisfy both prongs of *Strickland*; if the defendant fails to satisfy either prong, he or she cannot prevail on his or her claim. *Downs*, 2017 IL App (2d) 121156-C, ¶ 39.

¶ 77                                    A. Deficient Performance

¶ 78    Defendant argues that, at the preliminary *Krankel* hearing, he raised his allegations concerning Taylor Carlson and supported them only with his own representation as to what Taylor would testify to. He contends that, in order for the trial court to find that trial counsel performed deficiently on this ground, it needed to know the exact nature and substance of Taylor's testimony. At the adversarial *Krankel* hearing, he notes, *Krankel* counsel did not present an affidavit or any testimony from Taylor and, instead, relied on trial counsel's testimony admitting that he had not interviewed Taylor. Further, defendant asserts, the record suggests that *Krankel* counsel did not

even attempt to obtain evidence to support the claim, as the record does not contain a subpoena for Taylor.

¶ 79    As to his allegation that trial counsel failed to investigate whether the overhear tape had been tampered with, defendant notes that, at the preliminary inquiry, he supported his assertions with only his personal suspicions concerning the tape. The trial court, he asserts, needed evidence showing that the overhear recording had actually been tampered with. *Krankel* counsel, defendant notes, relied on trial counsel's testimony that he had not investigated defendant's claim concerning the recording. The record, he notes, does not indicate that *Krankel* counsel made a request for funds to have the overhear recording examined by an expert.

¶ 80    Defendant reasons that, because *Krankel* counsel included in his motion the allegations concerning both Taylor and the overhear tape, he must have believed them to be non-frivolous. See *Downs*, 2017 IL App (2d) 121156-C, ¶ 48 (an attorney, including a *Krankel* attorney, has an ethical obligation not to present a frivolous pleading) (citing Ill. S. Ct. R. 137 (eff. July 1, 2013); Ill. R. Prof'l Conduct 2010 R. 3.1 (eff. Jan. 1, 2010)). Accordingly, defendant asserts, it was incumbent upon *Krankel* counsel, at the adversarial hearing, to present the claims with evidentiary support, which counsel did not do. Defendant argues that this fell below an objective standard of reasonableness. He analogizes to postconviction case law, where courts have held that appointed counsel's failure to investigate and, if possible, attach supporting documentation for a *pro se* ineffective-assistance claim fell short of reasonable assistance. See, *e.g.*, *People v. Enis*, 194 Ill. 2d 361, 380 (2000) ("[a] claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness. [Citations.] In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the [petitioner], and further review of the claim is

unnecessary"; however, further holding that, even if evidence had been considered in lieu of affidavit, outcome would not have been different, because the evidence of the [petitioner's] guilt was overwhelming); *People v. Johnson*, 154 Ill. 2d 227, 240, 245-46 (1993) ("[a] post-conviction petition which is not supported by affidavits or other supporting documents is generally dismissed without an evidentiary hearing unless the petitioner's allegations stand uncontradicted and are clearly supported by the record"; "At a minimum, [postconviction] counsel had an obligation to attempt to obtain evidentiary support for claims raised in the post-conviction petition"); *People v. Treadway*, 245 Ill. App. 3d 1023, 1026-27 (1993) (reversing denial of second-stage postconviction petition, where postconviction counsel did not file an Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) affidavit and record did not show that counsel examined the record of the original proceedings or that he amended the [petitioner's] *pro se* petition to adequately present his claims; trial court erroneously dismissed petition by presuming outcome would not have been different; no such presumption could be made in absence of postconviction counsel's certification that he investigated the allegations). Defendant contends that *Krankel* counsel's failures in this case are analogous to these cases in which appointed postconviction counsel failed to properly support claims raised in a postconviction petition and argues that *Krankel* counsel should be expected to do at least as much as postconviction counsel. He notes that courts have held that remand is required where postconviction counsel failed to fulfill the duties required by Rule 651(c), which requires counsel to consult with the petitioner, examine the record, and make any amendments to the *pro se* petition necessary to adequately present the petitioner's claim), thereby, assuring the reasonable assistance required by statute (*People v. Wallace*, 2016 IL App (1st) 142758, ¶ 24), *regardless of whether the claims raised in the petition had merit*. See, *e.g.*, *People v. Suarez*, 224 Ill. 2d 37, 47 (2007) (remand required where counsel failed to fulfill duties under Rule 651(c),

regardless of whether the claims raised in postconviction petition had merit). Defendant urges that he was entitled to constitutionally-effective assistance (*i.e.*, reasonably effective assistance pursuant to *Strickland*) of *Krankel* counsel, a higher standard than the statutory right to reasonable assistance that applies in the postconviction context (*Moore*, 189 Ill. 2d at 541; see also *People v. Custer*, 2019 IL 123339, ¶ 30 (reasonable-assistance standard in postconviction context is "significantly lower than the one mandated at trial by our state and federal constitutions")), and that, because counsel adopted but failed to properly support his claims with affidavits or other evidence, *Krankel* counsel should be deemed to have provided ineffective assistance, *regardless* of the merits of his claims.

¶ 81    The State responds that, as to the claim concerning Taylor, Sherry did not testify to the events surrounding the underlying charges, *i.e.*, Mitchell taking photographs at Sherry's property at defendant's request or defendant pointing out Sherry, her husband, and their vehicle at the Walmart so that Mitchell could identify them. It contends that the trial court properly determined that there was no reasonable probability that Taylor's testimony would change the outcome, as there was strong evidence to support Sherry's testimony that she was, in fact, distressed and afraid, as evidenced by defendant's prior convictions in Kane County for violation of the order of protection and for aggravated stalking against Sherry. It was Mitchell, the State notes, who testified about the underlying charged events, and Taylor's testimony would not have impacted that testimony.

¶ 82    As to the overhear tape, the State notes that Transier testified that he and defendant listened to the CD of the overhear at the jail prior to his trial. Defendant complained that he thought that the overhear tape had been tampered with, because there were portions that were not recorded and portions that were inaudible. The State notes, however, that defendant never expressed to trial

counsel or the trial court that the *recorded* words were not accurate. Rather, he complained that there were times when he would tell Mitchell, "No, don't do that," or "you can't do that," which were not reflected in the transcript or audio. However, the State notes, those allegedly-missing words were about *future* events, not the *past* ones that were at issue in the charges. Defendant, according to the State, has never explained what he believed was tampered with on the recording or why that would impact the result of the proceedings. The State further asserts that the transcript of the overhear reflects that defendant was responsive to Mitchell's statements that related to the charges and never denied or indicated that he was unclear what Mitchell was referring to when he made the statements.

¶ 83    Turning first to the overhear claim, we conclude that the trial court did not err in finding no deficient performance by *Krankel* counsel. The trial court noted that the overhear tape contained no indications that any portion of defendant's and Mitchell's conversation were out of sequence, that there were gaps of time, or anything that would warrant a professional analysis of the tape. The court determined that, in the absence of any such indication, counsel was left only with defendant's mere allegations and, thus, it was not objectively unreasonable for counsel to follow up with professional analysis of the tape. We find no error with the trial court's assessment that the claim lacked merit. The acts underlying the charges against defendant were that he surveilled Sherry at the Walmart on Sycamore Road and that he directed Mitchell to enter and take photos of the farm, a protected address. In the conversation recorded on the overhear tape, Mitchell and defendant discussed, among others, events that had already occurred. Mitchell stated, at one point, "I looked out for you. You know, I'm going, doing reconnaissance missions and shit for your ass and all that shit, man," to which defendant responded, "yep." Mitchell also stated, "So we know—you know, we—we helping each other out, you know what I mean? You know, I go

out there. You know, I took the pictures of farm and shit for you, you know what I mean? Just take—taking the chance, you know what I mean? Getting tied up in this mess, man." Defendant responded, "I don't want you tied up in what happens. It came back to [De Kalb sheriff's detective] Brad Carls that I was associated with you and that you were a hit man." Later in the conversation, Mitchell stated, "I said remember back up in September, October, when you came and picked me up and we went up to Walmart and you pointed Sherry and Jeff out to me? You showed me the— the black Mercedes, right? What—what other car does she drive?" Defendant responded, "They drive a Ford Explorer, the one that you saw in the driveway." Mitchell stated, "Yes." Defendant then stated, "And they drive a—another Mercedes, a—a CLK 320." At no point in the proceedings has defendant asserted that these portions of the overhear tape did not contain his words or that portions of these conversations are missing.

¶ 84    Defendant first raised the tampering issue at sentencing, during his statement in allocution. He alleged that detective Carls had tampered with tape, because he allegedly had an affair with Sherry. Defendant asserted he raised the issue with trial counsel. He also asserted that a disbarred attorney fabricated the tape. During the preliminary *Krankel* inquiry, Transier stated that he and defendant listened to the tape in the jail and that defendant told him that portions were missing. He also stated that he did not have any evidence of any tampering. At the adversarial *Krankel* hearing, which we review here, Transier testified that defendant raised the tampering issue, asserting that portions of the conversation were not recorded and other portions were inaudible. Transier testified that he did not take any actions in terms of investigating or soliciting anyone's help to determine whether defendant's suspicions were accurate. Critically, he stated that, during his conversations with defendant, defendant never challenged that the portions that *were* audible were in fact his own and Mitchell's words. Indeed, there is no indication in the record that

defendant ever challenged the recorded conversation. This is highly damaging to his ineffective-assistance claim.

¶ 85    Further undermining his argument are defendant's assertions concerning the missing or inaudible portions of the tape, which, as the State notes, involve future events, not the charged conduct. Transier testified as to the alleged missing portions that defendant told him that he allegedly told Mitchell not to go to the property that was subject to the order of protection. "No, Ty, don't do that." Transier explained that these statements related to Mitchell going to the property at some point in the future, after their lunch. Thus, clearly, in the absence of anything to the contrary, the allegedly-missing portions of the overhear tape did not concern, and were not relevant to, the charged conduct. Defendant's claim lacked merit. Defendant's argument that *Krankel* counsel was deficient for failing to present necessary supporting evidence for his overhear claim, therefore, fails.

¶ 86    We also conclude that *Krankel* counsel did not deficiently represent defendant as to his claims concerning Taylor's alleged testimony. This claim, too, lacked merit. At sentencing, defendant alleged that he had asked Transier to contact Taylor, who would have testified "what her mother was all about." At the preliminary *Krankel* hearing, defendant asserted that Taylor would have testified that Sherry used drugs, was a drunk and a liar who fabricated stories and "does this constantly to other people," and that she had been untruthful in regard to an order of protection issued against her in Will County. Transier responded that he did not speak to Taylor, because she would only provide testimony about Sherry's drinking habits and her overall character as being dishonest. In his motion filed for the adversarial hearing, *Krankel* counsel alleged that Transier was ineffective for failing to call Taylor as a witness to impeach Sherry's credibility. At the hearing, Transier explained that he and defendant discussed Taylor's potential testimony, but

Transier did not call her to testify at trial, because he was uncertain he could use information concerning alleged alcohol abuse and lack of trustworthiness at trial. He also stated that there was no specific information concerning her testimony that led him to believe that Taylor could provide relevant information about the charges *against defendant*.

¶ 87 The trial court found that it was unclear if Taylor's testimony would have been admissible. The court also noted that Sherry did not testify that she saw Mitchell at the farm or saw defendant and Mitchell at Walmart. Rather, her testimony concerned her emotional distress, her feeling that she could not go anywhere by herself, and the violations of the orders of protection in Kane County. The trial court also found that it was unlikely that Sherry's testimony would have been impeached by Taylor's testimony that she was a liar and alcoholic, where defendant had been convicted of violating orders of protection. This could not have undercut Sherry's testimony, the court determined, that she was afraid.

¶ 88 We cannot conclude that *Krankel* counsel's performance was deficient. As the trial court determined, the scope of Sherry's testimony was very narrow: she testified to her feelings concerning defendant's actions after she obtained an order of protection against him in 2011 in Kane County. He was arrested and, in 2012, convicted of aggravated stalking and violating the order of protection. She also related that, in late 2012 and early 2013, she saw defendant around town and received numerous calls from the GPS officer that indicated that defendant was bordering the perimeter of a protected address. She testified that she did not feel safe and was afraid to go anywhere alone. Sherry's testimony did not touch upon the underlying charges against defendant; she did not testify that she saw Mitchell at the farm and she did not testify that she (or her husband) saw defendant and Mitchell at Walmart. *Krankel* counsel's failure to obtain an affidavit from Taylor was not deficient. The trial court did not err in determining that Taylor's testimony would

not impeach Sherry's credibility and, in any event, Sherry's testimony did not touch upon the conduct underlying the charges against defendant. Mitchell, not Sherry, provided that testimony. We further note that the stalking statute contains a reasonable-person standard (720 ILCS 5/12-7.3(a) (West 2018) (a person commits stalking when they knowingly engage "in a course of conduct directed at a specific person, and he or she knows that this course of conduct would cause a reasonable person to: (1) fear for" their safety; or "(2) suffer other emotional distress."), and the jury was instructed accordingly. Even if Sherry's credibility had been impeached by Taylor's testimony, it would have carried little to no weight in the jury's assessment of defendant's conduct, because the jury was instructed, pursuant to the statute, to assess it with respect to its effect on a reasonable person, not the victim.

¶ 89    Defendant's argument that the statutorily-derived lower ineffectiveness standard for postconviction counsel applies to set a floor in assessing *Krankel* counsel's performance under the *Strickland* standard and required *Krankel* counsel here to present defendant's overhear and Taylor claims with evidentiary support is unconvincing. Defendant does not cite to any relevant authority, but merely analogizes to postconviction case law, to support his argument that *Krankel* counsel must attach an affidavit or other evidence for each of a defendant's ineffective-assistance claims that counsel deems to be non-frivolous. We note that, in the postconviction context, unlike here, there is a statutory requirement to provide evidentiary support or to explain its absence. See 725 ILCS 5/122-2 (West 2018) ("The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached."). In any event, the cases upon which defendant relies involved egregious circumstances that are not present in this case. See, *e.g.*, *Suarez*, 224 Ill. 2d at 43-47 (reversing second-stage dismissal of postconviction petition, where counsel filed a supplemental petition but nothing therein reflected that she had

consulted with the defendant; thus, counsel failed to comply with Rule 651(c); remand was required where counsel failed to fulfill duties under Rule 651(c), regardless of whether the claims raised in the petition had merit); *Turner*, 187 Ill. App. 3d at 412-15 (reversing second-stage dismissal of post-conviction petition, where postconviction counsel did not file an amended postconviction petition or attach any affidavits to the *pro se* petition; failure to amend to allege ineffective assistance of appellate counsel to overcome procedural bar and other omissions constituted deficient performance; failure to attach any affidavits or offer any explanation for their absence was unreasonable, where he even failed to include an affidavit from the defendant describing the evidence or identifying witnesses who had knowledge of such; counsel's performance "represents a total failure of representation," given totality of circumstances); *Johnson*, 154 Ill. 2d at 239-41 246 (postconviction counsel did not filed Rule 651(c) affidavit certifying he discharged his duties as required by the rule, and the defendant argued that counsel failed to interview witnesses, collected no evidence to support the claims, attached no affidavits or other records to the amended petition, and failed to explain the absence of supporting documentation; holding that, although in an "ordinary case," a trial court may reasonably presume, in absence of supporting affidavits or other documents, that postconviction counsel made a concerted effort to obtain such documentations but was unable to do so, record in the case showed counsel did not do so; counsel did not provide reasonable level of assistance). Here, in contrast, *Krankel* counsel consulted with defendant and presented in his motion four allegations, two of which (the overhear and Taylor claims) defendant addresses on appeal. There was no total failure of representation by *Krankel* counsel.

¶ 90                                    B. Prejudice

¶ 91    Given that we conclude that *Krankel* counsel's performance was not deficient, we need not address *Strickland's* prejudice prong. *Downs*, 2017 IL App (2d) 121156-C, ¶ 39.  However, the issue is easily-resolved and, for the following reasons, we conclude that, even if *Krankel* counsel's performance was deficient, counsel's deficient performance did not prejudice defendant.

¶ 92    As to *Strickland's* prejudice prong, defendant argues that, because *Krankel* counsel presented no evidence from which the trial court could make factual findings on the claims at issue, there is an *insufficient factual basis* for this court to fairly assess whether there is a reasonable probability that the result of the proceeding would have been different.  *Krankel* counsel's deficient performance, defendant asserts, undermines confidence in the outcome of the *Krankel* hearing.

¶ 93    The State responds that defendant has forfeited any argument concerning prejudice, because he fails to address it on appeal.  Further, it contends that, to extent that defendant claims that matters outside the record would assist him in proving his ineffective-assistance-of-trial-counsel claims, the proper remedy would be for him to file a petition for postconviction relief.  See *Cherry*, 2016 IL 118728, ¶ 33 (viability of *Strickland* claim will often turn on matters outside the record and the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a mechanism for addressing that, because it allows for the raising of "constitutional questions which, by their nature, depend[ ] upon facts not found in the record") (quoting *People v. Thomas*, 38 Ill. 2d 321, 324 (1967)).  In any event, the State also contends that defendant has never addressed why the tampering issue would have impacted the result of the proceedings.  It maintains that defendant has failed to explain how inaudible or even missing words or portions of the conversation, if true, would negate defendant's responses to Mitchell's statements about the events related to the charges against defendant.  As to Taylor, the State contends that the trial court correctly determined that there was no reasonable probability that Taylor's testimony would have changed the outcome,

where it was Mitchell who testified to, and was recorded speaking about, the underlying events, not Sherry.

¶ 94    We conclude that the trial court did not err in determining that, even if *Krankel* counsel's failure to obtain an affidavit from Taylor and his failure to seek to have the overhear tape professionally examined constituted deficient performance, there was no reasonable probability that, but for the errors, the result of the proceeding would have been different.  Defendant's assertions about the omissions and inaudible portions of the overhear tape, as noted, center on his alleged instructions to Mitchell about Mitchell's future actions.  Defendant told Transier that he had told Mitchell not to go to the property that was subject to the order of protection at some point in the future after their lunch: "No, don't do that," as to the farm and "No, Ty, don't do that.  No, Ty, you can't do that."  This alleged portion of their conversation was completely unrelated and irrelevant to the underlying charges.

¶ 95    As to Taylor's alleged testimony, the trial court correctly determined that she would not have challenged Sherry's credibility.  Again, as noted, Sherry's testimony related her fear resulting from defendant's conduct leading to prior convictions and his actions while wearing the GPS device.  There is no reasonable probability that the result of the proceedings would have been different, had Taylor testified that Sherry was untruthful and an alcoholic.  Even if Sherry's credibility was impeached by Taylor's testimony, it would not have affected the outcome of the trial, because it would not have affected the relevant testimony—from Mitchell—concerning the conduct underlying the charges against defendant—defendant placing Sherry under surveillance at the Walmart and his directing Mitchell to enter, and take pictures of, a protected address.

¶ 96    In summary, the trial court did not err in denying defendant's *Krankel* motion.

¶ 97                                    III. CONCLUSION

¶ 98    For the reasons stated, the judgment of the circuit court of De Kalb County is affirmed.

¶ 99    Affirmed.